UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA, <br><br> Plaintiff, <br><br> v. <br><br> SAMUEL CHRISTOPHER GARRETT, <br><br> Defendant. | Case No. 21-cr-00326-SI-1 <br><br> **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS** <br><br> Re: Dkt. No. 44 |

On December 30, 2019, federal agents received notice that Samuel Garrett, a registered sex offender, was planning to fly overseas to Laos. That night, agents stopped Garrett in the jet bridge at SFO. Garrett ultimately boarded his flight but left several electronic devices with the agents, who stated they would perform additional searches. A subsequent "forensic" search of images and videos on Garrett's laptop surfaced child pornography which led to subsequent search warrants and Garrett's indictment in this case. Garrett now moves to suppress the evidence found via the laptop's forensic examination and all subsequent fruits of that search. Dkt. No. 44 (Motion).

The issue is whether federal agents had "reasonable suspicion" to conduct a warrantless forensic search of Garrett's laptop. Because the totality of circumstances supports a "particularized and objective basis for suspecting [Garrett] of criminal activity," *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013), the Court **DENIES** the motion to suppress.

**BACKGROUND**

On the evening of December 30, 2019, Samuel Garrett came to the attention of federal agents through Operation Angel Watch—a program designed to alert law enforcement when a person previously convicted of a sex crime against a child plans to travel overseas. Garrett was previously

convicted of child molestation and is a registered sex offender. Dkt. No. 53 at 6 n. 1 (Reply). When federal agents at SFO learned that Garrett planned to travel to Laos later that night, Dkt. No. 45, Ex. B ¶ 17, they began an investigation that would ultimately lead to Garrett's indictment for possession of child pornography under 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2).

While Garrett was waiting to board his outbound flight at SFO at around 9:30pm, agents examined Garrett's checked luggage outside of his presence. Dkt. No. 45, Ex. A (HSI Report). The following items were discovered in his luggage: (1) condoms, (2) Viagra pills, (3) a "ManGroomer" shaving tool, (4) several maps of Southeast Asian counties, including Vietnam, Cambodia, and Laos, (5) a cell phone, (6) sex offender registry paperwork, and (7) a receipt for a money transfer to a person in Cambodia. Dkt. No. 45, Ex. B ¶ 18. One day prior, Garrett had been denied entry to Cambodia from Hong Kong and returned to the United States—a fact agents confirmed both before and during the ensuing jet bridge encounter. See Dkt. No. 45, Ex. A ¶¶ 16, 19 (Warrant Affidavit).

The boarding process for Garrett's flight began around 11:30pm. Dkt. No. 44-1 ¶ 3 (Garrett Decl.). While Garrett was navigating the jet bridge to enter the airplane, federal agents pulled him aside to an adjacent jet bridge which was exposed to the elements. *Id*. ¶ 3-5. There, agents questioned Garrett as to the reason for his travel. Garrett stated he was visiting friends and going on vacation, and agents noticed Garrett appearing "visibly nervous as he was shaking and staring away" from the agents while answering their questions. Dkt. No. 45, Ex. A. The agents then asked Garrett whether they could search his belongings: luggage, two cell phones, and a laptop. Garrett did not object. Dkt. No. 44-1 ¶ 4-7.

While the last boarding group entered the plane, agents conducted a "manual" search of Garrett's electronic devices—a search that entails clicking and scrolling through a device without the aid of outside technology. Agents informed Garrett that he would not "be able to leave until they looked in the phones and laptop." Dkt. No. 44-1 ¶ 8. On one of the cellphones (which was not password protected), agents "found messages to contacts with profile pictures of young Asian males of an age difficult to determine due to the size and quality of the pictures." Dkt. No. 45, Ex. B ¶ 19. Garrett next provided the password for his laptop. But with the flight about to disembark, agents presented Garrett with a choice: stay behind until the search was complete, or board the flight and

leave his devices behind so the search could continue. Dkt. No. 44-1 ¶ 10. Garrett boarded the flight to Laos and left the devices behind.

The forensic examination—which would reveal child pornography and provide the probable cause basis for subsequent search warrants—followed. On January 2, 2020, agents turned the cell phones and laptop over to a Computer Forensic Agent, who extracted images and videos from the devices. Dkt. No. 45, Ex. A ¶ 20. Unlike a "manual" search, a "forensic" search allows investigators to reach far deeper into a device, including password-protected, hidden or encrypted, and even deleted files. On January 14, 2020, agents discovered a child pornography video, "122 images that could be classified as either child pornography or child erotica," and "multiple images of Garrett with young Asian boys." *Id*. ¶¶ 22, 23. The forensic search also revealed a Facebook Messenger conversation between Garrett "and a young Asian boy in Cambodia." *Id*. ¶ 24.

Based on the forensic discoveries, the US Attorneys Office applied for search warrants targeting: the already-seized devices, Garrett's Facebook account, Garrett's email account, and his home, vehicle, and person. On March 2, 2021, the day after the USAO filed its indictment, a search of Garrett's house turned up a MicroSD card containing 48 videos with suspected child pornography. Now before the Court is Garrett's motion to suppress the evidence obtained through the forensic search of his laptop and all fruits that flowed from that evidence. Dkt. No. 44.

**LEGAL STANDARD**

"The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores–Montano*, 541 U.S. 149, 152 (2004). The same applies for persons and effects leaving the country. *United States v. Seljan*, 547 F.3d 993, 1002 (9th Cir. 2008). Accordingly, government agents may conduct "a quick look and unintrusive search of laptops" carried by individuals entering and exiting the country even if there is no reasonable suspicion of criminal wrongdoing. *United States v. Cotterman*, 709 F.3d 952, 960 (9th Cir. 2013), citing *United States v. Arnold*, 533 F.3d 1003, 1009 (9th Cir. 2008) (border search reasonable where agents "simply 'had [traveler] boot [the laptop] up" to look what was inside).

But reasonable suspicion is required when, "after their initial search at the border," agents

make "copies of the hard drives" and perform "forensic evaluations of the computers." *Cotterman*, 709 F.3d at 966 (describing a forensic search as "essentially a computer strip search"). Reasonable suspicion entails a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). To determine whether agents possessed reasonable suspicion, a court must consider "the totality of the circumstances." *Id*. at 417. "[E]ven when factors considered in isolation from each other are susceptible to an innocent explanation, they may collectively amount to a reasonable suspicion." *United States v. Berber–Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007). The standard should leave "ample room for agents to draw on their expertise and experience to pick up on subtle cues that criminal activity may be afoot." *Cotterman*, 709 F.3d at 967.

The Ninth Circuit's opinion in *Cotterman* is illustrative. 709 F.3d 952. There, the defendant and his wife were driving back to the United States from Mexico with two laptops and three cameras in their possession. *Id*. at 957. During primary inspection at the border, agents received a notice from Operation Angel Watch[1] that defendant was a repeat sex offender potentially involved in child sex tourism. *Id*. A cursory review of defendant's laptop and direct questioning failed to turn over anything incriminating, but agents did encounter "password-protected files" on the laptop that they were "unable to access." *Id*. at 958. Agents then allowed the couple to leave, but "retained" the laptop. *Id*. An investigator later "used forensic software that often must run for several hours to examine copies of the laptop hard drives," leading to the discovery of child pornography. *Id*. In an *en banc* opinion, the Ninth Circuit concluded the agents had reasonable suspicion for the forensic search given: (1) the Operation Angel Watch Alert, (2) prior child-related convictions, (3) frequent travels, (4) "crossing from a country known for sex tourism," (5) a collection of electronic equipment, and (6) "the parameters" of the Operation Angel Watch program. *Id*. at 969.[2]

---

[1] The notification itself came from the Treasury Enforcement Communication System, which "keeps track of individuals entering and exiting the country and of individuals involved in or suspected to be involved in crimes." *Cotterman*, 709 F.3d at 957 n 3. However, "the alert was part of Operation Angel Watch." *Id*. at 958.

[2] The court later opined that the password protected files were "relevant" to the inquiry but expressed reluctance "to place much weight on this factor." *Id*. at 969.

4

**DISCUSSION**

In the motion to suppress now pending, Garrett argues that the agents who questioned him in the jet bridge lacked reasonable suspicion to conduct a forensic examination of his laptop. Reasonable suspicion aside, he also argues he did not voluntarily consent to the initial manual or subsequent forensic search of his electronic devices. Accordingly, Garrett asks this Court to suppress the evidence discovered through the forensic examination, as well as all "fruits" obtained from that search. Because the Court concludes federal agents had reasonable suspicion to conduct a forensic examination of Garrett's laptop, the Court need not reach the consent issue.

Standing alone, a person's status as a registered sex offender cannot create reasonable suspicion to perform a warrantless intrusive search. What *Cotterman* makes clear, however, is that one's status as a sex offender paired with *presently existing* indicia of involvement in a sex crime—e.g., traveling to or from a country known for child sex tourism with a collection of electronic devices—may give rise to reasonable suspicion to forensically examine a suspect's devices. *See Cotterman*, 709 F.3d at 969. While individual factors may be construed as "innocent" when considered in isolation and without proper context, the reasonable suspicion inquiry focuses on the totality of the circumstances. *Berber–Tinoco*, 510 F.3d at 1087. Further, the evidence should be viewed through the experiential lens of an agent trained to "pick up on subtle cues" of the suspected criminal activity. *Cotterman*, 709 F.3d at 967, 970 ("[W]e credit the agents' observations and experience in acting upon significant myriad factors that support reasonable suspicion.").

The facts pertaining to Garrett's search surpass those set forth in *Cotterman*. Operation Angel Watch flagged Garrett as a registered sex offender planning to travel to a region "known for sex tourism." *Id*. at 969. A manual search of Garrett's checked baggage revealed several items suggestive of an intent to engage in sex acts: (1) condoms, (2) Viagra pills, and (3) a "ManGroomer" shaving tool.[3] As Garrett informed the agent, he had recently been denied entry into Cambodia.

But when agents confronted Garrett in the jet bridge, he appeared nervous and "shaking."

---

[3] These objects could also suggest an intent to engage in lawful conduct.

5

While Garrett's shaking might be attributable to factors other than nerves (e.g., an existing "fine motor tremor in [his] hands," a family history of Parkinson's, and the cold weather in the jet bridge, Dkt. No. 44-1 ¶¶ 2, 5), there is no evidence that agents knew these facts at the time or attributed Garrett's shaking to those facts. From the agent's perspective, Garrett tremors indicated that he was "visibility nervous." See *Cotterman*, 709 F.3d at 968 ("the agents' *understanding* of the objective facts, albeit mistaken, is the baseline for determining reasonable suspicion."). The discovery of messages delivered to individuals who appeared to be "young Asian Males" further pushed the agents' suspicion over the objective reasonableness threshold. Thus, when viewing the totality of the circumstances and making allowances for the "subtle cues" that may indicate unlawful sex tourism to an experienced investigator, conclude that there was reasonable suspicion to forensically examine Garrett's laptop.

Accordingly, the Court need not reach the additional issues raised by the motion.

## CONCLUSION

For the foregoing reasons, defendant Samuel Garrett's motion to suppress is **DENIED**.

**IT IS SO ORDERED**.

Dated: December 17, 2021

_____
SUSAN ILLSTON
United States District Judge